Citation Nr: 1237358 
Decision Date: 10/31/12 Archive Date: 11/09/12

DOCKET NO. 07-31 016A ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Houston, Texas


THE ISSUES

1. Entitlement to service connection for a bilateral shoulder disability.

2. Entitlement to service connection for a right hip disability.

3. Whether severance of service connection for a left hip disability, status-post hip replacement, effective October 1, 2007, was proper.

4. Whether severance of service connection for a lumbar spine disability, effective October 1, 2007, was proper.


REPRESENTATION

Veteran represented by: The American Legion




WITNESS AT HEARING ON APPEAL

Veteran and his spouse


ATTORNEY FOR THE BOARD

Scott Shoreman, Counsel


INTRODUCTION

The Veteran had active service from March 1969 to March 1981.

This matter comes before the Board of Veterans' Appeals (Board) from November 2004, November 2005, and June 2007 rating decisions of the Department of Veterans Affairs (VA) Regional Office (RO) in Houston, Texas.

In January 2010, the Veteran appeared at the RO and testified at a videoconference hearing that was conducted by the undersigned Acting Veterans Law Judge sitting in Washington, DC. A transcript of this hearing is of record. 

This claim was previously before the Board in August 2010, at which time the Board remanded it for additional development. The requested development has been completed, and the claim is properly before the Board for appellate consideration.

As will be discussed in the decision below, this case has two disparate outcomes (i.e., denial of service connection for disabilities of the shoulders and right hip and restoration of service connection for disabilities of the left hip and lumbar spine), although it appears that the disabilities affecting the shoulders, hips, and lumbar spine are similarly situated in that none currently have a diagnosis of rheumatoid arthritis for which service connection is in effect for multiple joints. It is emphasized that the application of the prevailing law and regulations, by which the Board is bound, upon the unique set of facts as presented in this case have produced this seemingly inconsistent result. 

This appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c) (2011). 38 U.S.C.A. § 7107(a)(2) (West 2002).


FINDINGS OF FACT

1. The current bilateral shoulder disability, first diagnosed after service beyond the one-year presumptive period for a chronic disease, is unrelated to an injury, disease, or event of service origin including service-connected rheumatoid arthritis. 

2. A right hip disability was not present during active duty; a right hip disability was not manifest to a compensable degree within one year of separation from active duty in March 1981; and the current right hip disability, first diagnosed after service beyond the one-year presumptive period for a chronic disease, is unrelated to an injury, disease, or event of service origin including service-connected rheumatoid arthritis. 

3. In a July 1981 rating decision, the RO granted service connection for rheumatoid arthritis in multiple joints, assigning a 20 percent evaluation; in a June 1983 rating decision, the RO reduced the rating to 0 percent. 

4. In a November 2004 rating decision, the RO granted service connection for left hip arthroplasty and rheumatoid arthritis, lumbar spine, in place of the previous evaluation of rheumatoid arthritis in multiple joints, assigning compensable ratings for each disability. 

5. In a November 2005 rating decision, the RO proposed to sever service connection for left hip arthroplasty and rheumatoid arthritis, lumbar spine, and it restored service connection for rheumatoid arthritis in multiple joints at a noncompensable rating; the proposed severance action was effectuated in a June 2007 rating decision, to be effective October 1, 2007.

6. Service connection for left hip arthroplasty and rheumatoid arthritis, lumbar spine, was essentially in effect for more than 10 years, and there is no evidence that the original grant of service connection was based on fraud or that the Veteran did not have the requisite service and character of discharge.


CONCLUSIONS OF LAW

1. A bilateral shoulder disability was not due to disease or injury that was incurred in or aggravated by active service; a bilateral shoulder disability may not be presumed to have been incurred in service; and a bilateral shoulder disability is not proximately due to or aggravated by service-connected disability. 38 U.S.C.A. §§ 1101, 1110, 1112, 1116, 1131, 1137, 5107 (West 2002 & Supp. 2011); 38 C.F.R. §§ 3.303, 3.307, 3.309, 3.310 (2011).

2. A right hip disability was not due to disease or injury that was incurred in or aggravated by active service; a right hip disability may not be presumed to have been incurred in service; and a right hip disability is not proximately due to or aggravated by service-connected disability. 38 U.S.C.A. §§ 1101, 1110, 1112, 1116, 1131, 1137, 5107 (West 2002 & Supp. 2011); 38 C.F.R. §§ 3.303, 3.307, 3.309, 3.310 (2011). 

3. Service connection for a left hip disability, status-post hip replacement, was improperly severed as of October 1, 2007, and restoration of service connection for the disability is warranted. 38 U.S.C.A. §§ 1110, 1131, 1159 (West 2002 & Supp. 2011); 38 C.F.R. §§ 3.105(d), 3.957 (2011). 

4. Service connection for a lumbar spine disability was improperly severed as of October 1, 2007, and restoration of service connection for the disability is warranted. 38 U.S.C.A. §§ 1110, 1131, 1159 (West 2002 & Supp. 2011); 38 C.F.R. §§ 3.105(d), 3.957 (2011).


The Veterans Claims Assistance Act of 2000 (VCAA)

The VCAA, codified in part at 38 U.S.C.A. §§ 5103, 5103A, and implemented in part at 38 C.F.R § 3.159, amended VA's duties to notify and to assist a claimant in developing information and evidence necessary to substantiate a claim. 

With regard to the claims of the propriety of severance of service connection for a left hip disability, status-post hip replacement, and a lumbar spine disability, both effective October 1, 2007, as the decision herein is favorable to the Veteran, VCAA compliance need not be addressed. VCAA is addressed below in regard to the claims of service connection for a bilateral shoulder disability and a right hip disability. 

Duty to Notify

Under the VCAA, upon receipt of a complete or substantially complete application, VA must notify the claimant of the information and evidence not of record that is necessary to substantiate a claim, which information and evidence VA will obtain, and which information and evidence the claimant is expected to provide. 38 U.S.C.A. § 5103(a). 

The notice requirements may be satisfied if any errors in the timing or content of such notice are not prejudicial to the claimant. Mayfield v. Nicholson, 19 Vet. App. 103 (2005), rev'd on other grounds, 444 F.3d 1328 (Fed. Cir. 2006). 

The United States Court of Appeals for Veterans Claims (Court) decision in Pelegrini v. Principi, 18 Vet. App. 112 (2004) held, in part, that a VCAA notice as required by 38 U.S.C. § 5103(a), must be provided to a claimant before the initial unfavorable agency of original jurisdiction decision on a claim for VA benefits. Further, the notice requirements apply to all five elements of a service connection claim: 1) veteran status, 2) existence of a disability, 3) a connection between the veteran's service and the disability, 4) degree of disability, and 5) effective date of the disability. Dingess v. Nicholson, 19 Vet. App. 473 (2006). 

Here, full VCAA notice was furnished in September 2010, after the initial RO action, in contravention of Pelegrini, but any error as to the timing of the notice provided was cured by the RO's subsequent readjudication of the claims presented through its preparation and mailing of a supplemental statement of the case in April 2012. See Prickett v. Nicholson, 20 Vet. App. 370, 376-78 (2006) (validating the remedial measures of issuing fully compliant VCAA notification and readjudicating the claim in the form of a supplemental statement of the case to cure timing of a notification defect). The Veteran was notified of the type of evidence to substantiate the claims for service connection, namely, evidence of current disability; evidence of an injury or disease in service or event in service, causing injury or disease; and evidence of a relationship between the current disability and the injury, disease, or event in service. Additionally, the Veteran was notified that VA would obtain service records, VA records, and records of other Federal agencies and that he could submit other records not in the custody of a Federal agency, such as private medical records or with his authorization VA would obtain any such records on his behalf. In the September 2010 letter and in an April 2006 letter, the Veteran was also advised of the criteria for rating a disability and those governing effective dates of awards.

The notification complied with the requirements of Quartuccio v. Principi, 16 Vet. App. 183 (2002), identifying the evidence necessary to substantiate a claim and the relative duties of VA and the claimant to obtain evidence, and of Pelegrini v. Principi, 18 Vet. App. 112 (2004). 

Duty to Assist

VA also has a duty to assist a claimant under the VCAA. VA has obtained service, VA, and private treatment records; assisted the Veteran in obtaining evidence, particularly private treatment records; afforded the Veteran an examination in November 2010; and afforded the Veteran the opportunity to give testimony before the Board in January 2010. 

In regard to the personal hearing, in Bryant v. Shinseki, 23 Vet. App. 488 (2010), the United States Court of Appeals for Veterans Claims (Court) held that 38 C.F.R. § 3.103(c)(2) requires that the Veterans Law Judge who conducts a hearing fulfill two duties to comply with the above the regulation. These duties consist of (1) the duty to fully explain the issues and (2) the duty to suggest the submission of evidence that may have been overlooked. Here, during the Board hearing in January 2010, the Acting Veterans Law Judge indicated that the hearing would focus on the issue of entitlement to service connection for a bilateral shoulder disability and a right hip disability, and discussed the elements of the claims that were lacking to substantiate the claims. The Veteran was assisted at the hearing by an accredited representative from The American Legion. The representative and the undersigned Acting Veterans Law Judge asked questions to ascertain the etiology of the disabilities at issue. There was no pertinent evidence identified by the Veteran or his representative that might have been overlooked and that might substantiate the claims. The hearing focused on the elements necessary to substantiate the claims, and the Veteran, through his testimony, demonstrated that he had actual knowledge of the elements necessary to substantiate his claims for service connection. Neither the representative nor the Veteran has suggested any deficiency in the conduct of the hearing. Therefore, the Board finds that, consistent with Bryant, the Veterans Law Judge complied with the duties set forth in 38 C.F.R. § 3.103(c)(2).

In regard to the VA examination, the examiner considered the Veteran's history and provided a rationale for the conclusions reached. Thus, the Board finds the examinations and opinions adequate to decide the claim. See Stefl v. Nicholson, 21 Vet. App. 120, 123 (2007) (holding that medical opinion must be based on consideration of the veteran's prior medical history and examinations and also describe the disability, if any, in sufficient detail so that the Board's evaluation of the claimed disability will be a fully informed one). 

As there is no indication of the existence of additional evidence to substantiate the claims, the Board concludes that no further assistance to the Veteran in developing the facts pertinent to the claims is required to comply with the duty to assist. 



REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Applicable Law and Regulations

Service connection may be granted for disability resulting from disease or injury incurred in or aggravated by active service. 38 U.S.C.A. §§ 1110, 1131; 38 C.F.R. § 3.303. Service connection may be granted for any disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d). 

Specified diseases listed as chronic in nature, including arthritis, may be presumed to have been incurred in service, if the evidence shows that such disease became manifest to a degree of 10 percent or more within one year from separation from active service, even though there is no evidence of such disease during the period of service. 38 U.S.C.A. §§ 1101, 1112 (West 2002); 38 C.F.R. §§ 3.307(a), 3.309(a).

Subject to the limitations contained in §§ 3.114 and 3.957, service connection will be severed only where the evidence establishes that the grant was clearly and unmistakably erroneous (CUE). The burden of proof in such cases is upon the Government, and certain procedural safeguards must first be met. 38 C.F.R. § 3.105(d). See also Baughman v. Derwinski, 1 Vet. App. 563, 566 (1991). CUE is defined as "a very specific and rare kind of 'error.' It is the kind of error, of fact or of law, that when called to the attention of later reviewers compels the conclusion, to which reasonable minds could not differ, that the result would have been manifestly different but for the error." Fugo v. Brown, 6 Vet. App. 40, 43 (1993). 

To determine whether CUE was present under 38 C.F.R. § 3.105(a) in a prior determination, either the correct facts, as they were known at the time, were not before the adjudicator (i.e., more than a simple disagreement as to how the facts were weighed or evaluated) or the statutory or regulatory provisions extant at the time were incorrectly applied; the error must be undebatable and of the sort which, had it not been made, would have manifestly changed the outcome at the time it was made; and a determination that there was clear and unmistakable error must be based on the record and law that existed at the time of the prior adjudication in question. Damrel v. Brown, 6 Vet. App. 242, 245 (1994); Russell v. Principi, 3 Vet. App. 310, 313-14 (1992) (en banc). 

In determining whether service connection will be severed, VA may - and, in fact, must - consider evidence that was generated after the original decision was made. Stallworth v. Nicholson, 20 Vet. App. 482 (2006) (holding that a "severance decision focuses - not on whether the original decision was clearly erroneous - but on whether the current 'evidence establishes that [service connection] is clearly erroneous'" (quoting 38 C.F.R. § 3.105(d)); see Daniels v. Gober, 10 Vet. App. 474, 480 (1997) (holding that 38 C.F.R. § 3.105(d) "clearly contemplat[es] the consideration of evidence acquired after the original granting of service connection"). 

Service connection for any disability granted or continued under title 38 U.S.C., which has been in effect for 10 or more years, will not be severed except upon a showing that the original grant was based on fraud or it is clearly shown from military records that the person concerned did not have the requisite service or character of discharge. The 10-year period will be computed from the effective date of the Department of Veterans Affairs finding of service connection to the effective date of the rating decision severing service connection, after compliance with 38 C.F.R. § 3.105(d). 38 U.S.C.A. § 1159 (West 2002); 38 C.F.R. § 3.957 (2011). 

II. Factual Background

The Veteran seeks service connection for a bilateral shoulder disability and a right hip disability. He also seeks to reverse the severance of service connection for a left hip disability, status-post hip replacement, and a lumbar spine disability, both effective October 1, 2007.

The service treatment records show that in December 1970 the Veteran complained of low back pain after playing basketball. He was diagnosed with a low back strain. In August 1973 the Veteran was noted to have minimal to moderate recurring, aching lumbar pain that had lasted for a week. There was no loss of motion or radiation of pain. In December 1973 the Veteran complained of low back pain since playing with a small child on the floor two days before. On examination the back had minimal tenderness over the sacroiliac (SI) joint. The Veteran was diagnosed with a muscle strain. X-rays of the lumbosacral spine showed scoliosis and were noted to show no significant abnormalities.

In January 1975 the Veteran complained of low back pain. The impression was a muscle injury in the SI area. At a May 1976 examination the back was specifically noted to be normal. A September 1976 test for rheumatoid arthritis was positive. In January 1977 the Veteran was listed as having arthritic pain of the right shoulder, which was noted to be spreading to other joints. The service treatment records had previously shown right knee pain. In March 1977 the Veteran had full range of motion in all joints. It was noted that a rheumatoid arthritis test had been positive. Treatment records in April 1977 indicate rheumatoid arthritis in the shoulder and low back. The Veteran was diagnosed with a muscle spasm in the low back in July 1977 after complaining of low back pain of a day's duration. In August 1977 the Veteran complained of back pain of two week's duration. There was no known cause and the pain was not radiating. Range of motion was normal with discomfort at the left subscapular areas. Deep heat was applied to the back at physical therapy for two weeks and there was a complete relief of symptoms. During treatment in April 1980 the Veteran reported occasional pain in the shoulders; an examination was essentially negative, and the diagnosis was rheumatoid arthritis.

On medical history reports dated in May 1976, August 1977 and April 1980, the Veteran indicated never having had a painful or "trick" shoulder and that he had had recurrent back pain. An April 1980 examination did not show any abnormalities related to the hip, spine or shoulders besides a skin abnormality identified as striae on the anterior shoulder and chest.

The post-service records show that at a June 1981 VA examination the Veteran complained of periodic aching in his shoulders for which he did not take any medication. On examination there was no gross deformity of the shoulders, and no muscular spasm, atrophy or weakness about the shoulder girdle muscles. The Veteran did not complain of any tenderness to pressure on either shoulder. There was a normal range of motion with no crepitation. There was also a normal range of motion of the back and no complaints of tenderness to pressure over the spine or back muscles. There were no complaints regarding the hips. The diagnosis was history of rheumatoid arthritis involving the lumbosacral spine, shoulders, elbows, wrists, knees and ankles.

In a July 1981 rating decision, the RO granted service connection for rheumatoid arthritis in multiple joints, assigning a 20 percent evaluation, effective from March 1981; the RO did not specify the particular joints affected by rheumatoid arthritis, stating that the VA examination did not furnish objective findings or X-ray evidence of rheumatoid arthritis of any joint. 

At a May 1983 VA examination an examination of the back was normal. X-rays revealed no significant abnormality. The diagnosis was history of rheumatoid arthritis involving the back, hands, knees, right wrist, and right elbow with no positive objective physical findings on X-rays.

In a June 1983 rating decision, the RO reduced the rating of the rheumatoid arthritis in multiple joints, from 20 percent to 0 percent. 

The Veteran was hospitalized in July 1987 after falling off a truck at work. The final diagnosis was a closed head injury with multiple facial fractures and a knee injury. The Veteran said during treatment with a private orthopedist in July 1987 that he injured his low back in the work accident. He complained of severe pain to the lumbosacral spine that radiated down the legs. The diagnosis was an acute lumbar strain. A CAT scan showed an abnormal disc at L5-S1. During treatment with a private neurologist in August 1987, the Veteran had multiple complaints, including a back ache.

Private physical therapy records in November 1987 indicate that the Veteran began having back pain after the arthroscopic surgery for his knee following the July 1987 injury. It was noted that he appeared to be in acute distress secondary to disc problems. Also in November 1987, a private neurologist indicated that the Veteran reported constant back pain since the July 1987 accident. He was diagnosed with lumbosacral disc disease of a post traumatic basis and rule out left SI root irritation. 

During private hospitalization in January 1988, the Veteran was diagnosed with a lumbosacral strain after being admitted with back and leg pain. An MRI of the lumbar spine from February 1988 private treatment showed moderate degenerative disc disease and mild central bulging discs at L4-5 and L5-S1. A private orthopedist wrote in an April 1988 letter that during treatment in March 1988 the Veteran complained of a constant low back ache. An examination of the low back revealed flexion to 30 degrees with no spasm or list. Straight leg raise test was negative in the sitting position. A June 1988 EMG done due to low back and leg pain was normal. In August 1988 the Veteran underwent a bilateral L5-S1 hemilaminotomy, foraminotomy, discectomy and an L4-S1 fusion. 

The Veteran had a physical examination in May 1996 in connection with a Social Security claim at which he reported constant, dull, achy pain in the low back. On examination there was not tenderness and range of motion was reduced. Heel, toe, and tandem walks and squatting were normal. The assessment included a lumbar strain. 

Private neurology treatment records in August 2001 indicate that the Veteran had had back pain since the 1987 injury. The neurological examination was essentially unremarkable except for decreased pinprick sensation over the anterior aspect of the left thigh and decreased deep tendon reflexes over the left ankle and knee.

At an October 2001 VA examination the Veteran reported progressive pain and swelling that included the shoulders and back. The examiner noted the 1987 industrial accident and subsequent surgery. The Veteran said that at the time he was told that his back was worse because he had another arthritic process like rheumatoid arthritis. He said that he had been unable to work full time and that his part time work required heavy lifting, which left him in severe pain in his joints and back. The examination report states that the shoulder showed "adequate" forward flexion of 100 degrees, abduction of 180 degrees, external rotation of 90 degrees, and internal rotation of 90 degrees. The hips had an "adequate" of flexion of 125 degrees, extension of 30 degrees, external rotation of 60 degrees and internal rotation of 40 degrees. There was a severe loss of lordosis in the lumbar area, decreased forward flexion, and no lateral bending or rotation. The diagnosis was mild to moderate rheumatoid arthritis that involved several joints and degenerative joint disease, traumatic etiology most likely, status post lumbar fusion.

A March 2005 MRI of the hips from private treatment showed degenerative changes, left greater than right, and left hip joint effusion. Private treatment records indicate that the Veteran underwent a left total hip replacement in May 2004 due to severe arthritis.

The Veteran's wife wrote in a June 2004 statement that they had been married for 23 years and that she was aware of his arthritic condition when they married. She had witnessed this condition worsen over time. 

In a November 2004 rating decision, the RO granted service connection for left hip arthroplasty and rheumatoid arthritis, lumbar spine, in place of the previous evaluation of rheumatoid arthritis in multiple joints, assigning compensable ratings for each disability. 

At the time of a VA examination in April 2005, the Veteran reported having an increase in pain in the shoulders in the past year, especially with overhead activities and lifting. There was associated stiffness, and the Veteran denied swelling, heat, redness, locking, fatigability, or lack of endurance. The Veteran took Vicodin for relief of the pain, and there were flare-ups three to four times a month that lasted for days at a time. Range of motion of the left shoulder was normal and range of motion of the right shoulder was slightly reduced. It was noted that October 2004 X-rays showed a mild AC separation on the left with a small bony density previously described as prior trauma. There was an impression of posttraumatic and degenerative changes in both AC joints. The diagnosis was bilateral degenerative changes of the shoulders with mild to moderate symptomatology. Joint function was additionally limited by pain following repetitive use, and there was no evidence of acute or active rheumatoid arthritis in either shoulder. 

During VA treatment in April 2005 the right shoulder had good range of motion with a positive supraspinatus test. The right hip was noted to not have significant osteoarthritis changes and there was no left hip pain. A May 2005 MRI of the lumbar spine showed mild disc degeneration at L2-3 and mild central canal stenosis, and an MRI of the left shoulder showed degenerative changes of the AC joint. During VA treatment in June 2005 the Veteran had a left SI joint injection due to pain. A June 2005 MRI of the hip showed a trace of right hip effusion.

In a November 2005 rating decision, the RO proposed to sever service connection for left hip arthroplasty and rheumatoid arthritis, lumbar spine, and it restored service connection for rheumatoid arthritis in multiple joints at a noncompensable rating.

VA treatment records in January 2006 state that all blood work for rheumatoid arthritis was negative. VA treatment in February 2006 indicate constant numbness and tingling over the anterolateral left thigh that had happened after his left hip surgery and had become constant. The diagnosis was generalized osteoarthritis and lumbar spondylosis with hypertrophic stenosis, status post laminectomy and fusion. The Veteran was to take medication, and it was noted that he might need physical therapy.

VA rheumatology treatment records in March 2006 indicate that there was a low possibility that the Veteran had rheumatoid arthritis based on the physical examination, laboratory results, radiographic images and history. 

A private physician, I.O., M.D., wrote in May 2006 that he saw the Veteran for an opinion regarding joint pain. Dr. O reviewed the Veteran's records and performed testing. He concluded that the Veteran had severe osteoarthritis of the right hip and osteoarthritis of the left hip. There was also significant arthritis of the shoulders. The physician stated that the osteoarthritis, which was extensive for the Veteran's age, was mostly a result of physical exertion and strain from military service.

An MRI of the right hip from July 2006 private treatment showed moderate degenerative changes.

The Veteran had a VA rheumatology consultation in August 2006 for left shoulder pain that began six months before. There was an acute onset of sharp pain when the Veteran forgot to "protect" it. Taking hydrocodone helped make the pain tolerable. He also had right hip pain that came and went and was worse with increased activity. The left shoulder pain was diagnosed as likely bursitis and he received an injection for it. He was to continue taking hydrocodone for the right hip pain.

The Veteran underwent left shoulder surgery in December 2006 after an MRI showed superior labral anteroposterior (SLAP) tear. It was noted that he had left shoulder pain and did not report any injury. 

During VA treatment in January 2007 the Veteran reported right hip pain. He was able to walk and perform activities of daily living. Private treatment records with UT Physicians from January 2007 to December 2007 indicate that the Veteran was followed for osteoarthritis, for which he received morphine.

At a March 2007 VA pain consultation the Veteran was noted to have had six to seven months of pain relief from an SI joint injection. The pain was in both hips. The pain had returned to both sides of the hips. In April 2007 the Veteran had bilateral SI joint injections due to pain. VA treatment records in May 2007 indicate that the right hip pain did not prevent the Veteran from walking well and performing activities of daily living. The Veteran wanted injections for the hips, but because they appeared to be fine on X-rays they were not performed. An X-ray report of the right hip indicated that it was grossly normal. 

In a June 2007 rating decision, the RO effectuated the severance action that had been proposed in the November 2005 rating decision, to be effective October 1, 2007.

Dr. O wrote in an October 2007 statement that the Veteran had been misdiagnosed with rheumatoid arthritis, which he had never had. The Veteran had severe osteoarthritis involving multiple joints that was out of proportion to his age and was most likely related to military service.

In January 2008 the Veteran reported at VA treatment that he continued to have right hip pain that often woke him up at night. He constantly had to change positions to feel better, and the last steroid injection had been over six months before. At February 2009 VA treatment the Veteran had a steroid injection due to rotator cuff tenderness. 

At the time of a VA examination in May 2009, it was noted that the service treatment records showed joint pain and a diagnosis of rheumatoid arthritis and that a previous examination did not show rheumatoid arthritis. On examination the shoulders had a full range of motion with pain. The Veteran reported stiffness and pain in both shoulders. The examiner did not note other symptoms. X-rays of the left shoulder showed surgical screws at the humeri head and no radiographic evidence of a fracture or dislocation. Right shoulder X-rays were within normal limits. It was noted that the Veteran had hip pain, and there was evidence of pain with active motion. The examiner opined that the Veteran had osteoarthritis that was less likely as not manifested during active service and that the Veteran had been misdiagnosed with rheumatoid arthritis during service. The examiner stated that the current tests for rheumatoid arthritis were more accurate than what existed during the Veteran's service, and the positive test from service could have been a false positive. The Veteran's hip condition was related to osteoarthritis or degenerative joint disease, which was a condition of aging. Furthermore, the examiner stated osteoarthritis was due to wear and tear and did not spread from one joint to another or from the spine to hips.

At the time of a VA spine examination in May 2009, the Veteran reported pain and stiffness in the low back. There was no indication of radiculopathy, and the Vicodin he took was not for his back. The Veteran said he had flare-ups but did not indicate what caused them. There were no incapacitating episodes due to the back. The Veteran said that his daily activities were limited, but the examiner noted that the Veteran had not expressed such limitations due to his back at treatment. The examiner also noted that the Veteran rose out of a chair with flexion of 90 degrees without any difficulty or symptoms of pain or stiffness. When asked to flex the Veteran suddenly could not flex beyond 60 degrees. When asked by the examiner to do the best he could, the Veteran was able to flex to 90 degrees with stiffness. Extension, lateral flexion and lateral rotation were normal and there was no indication of lower extremity radiculopathy or sensory deprivation. 

A private physician, Dr. L, wrote in May 2009 that he treated the Veteran on a monthly basis for osteoarthritis. Dr. L felt that the Veteran was misdiagnosed with rheumatoid arthritis and had never had rheumatoid arthritis. The Veteran had severe osteoarthritis involving multiple joints that was out of proportion for his age and was most likely related to military service.

VA treatment records in June 2009 indicate that the Veteran had mild degenerative joint disease of the right hip. 

A private neurologist, B.N., M.D., wrote in January 2010 that he had treated the Veteran and diagnosed him with osteoarthritis. Based on the Veteran's history, he said it was a chronic disease and not an acute process. Dr. N did not see evidence of inflammatory arthritis, such as rheumatoid arthritis.

At a January 2010 hearing the Veteran testified that his back, shoulders and knees hurt during service. The pain had gotten progressively worse over the years. The Veteran's wife testified that he had gotten progressively worse over the years. The Veteran needed assistance putting on socks and shoes.

Lumbar X-rays from March 2010 private treatment showed lumbar spondylosis and a previous posterior spinal fusion at L4-S1 with a mature bone graft.

An August 2010 VA primary care VA treatment note shows that the Veteran had a diagnosis of osteoarthritis and that this could be incorrect given the severity at such a young age. It could be seronegative rheumatoid arthritis. Testing was indicated but does not appear to have been performed. 

A private neurologist, W.H.F., M.D., wrote in September 2010 that the Veteran had been under his care for chronic mechanical low back pain for more than 10 years. Dr. F continued that the chronic degenerative disc disease did not turn up overnight and that the Veteran had had it for many years. The Veteran most likely had mechanical low back pain and degenerative disc disease when he was in his 20s and 30s.

The Veteran's wife wrote in October 2010 that she had been aware of the Veteran's arthritic condition since they first met in 1980. The Veteran often complained of back and knee pain around that time and he sometimes used heat pads, ice packs and over-the-counter medications.

Two friends of the Veteran wrote in an undated statement submitted in November 2010 that they had known the Veteran since 1973 and that one of them served with him. Their work in service required heavy lifting. The Veteran reportedly took a large amount of aspirin at the recommendation of base medical personnel. The friends had been aware of the Veteran having arthritis after service, and when they saw him in 2010 he was in constant pain.

At the time of a VA examination in November 2010, the examiner noted that the claims file was reviewed. Regarding the shoulders, the Veteran did not report any specific injury or any event from military service. Examination of the left shoulder was normal except for healed surgical scars and a mildly positive impingement sign. The right shoulder had a positive impingement sign and there was tenderness to palpation and pain at the endpoints of motion. X-rays of the left shoulder showed surgical screws in the humeral head and were otherwise normal, and X-rays of the right shoulder were within normal limits. The examiner diagnosed the Veteran with age related changes in the shoulders not associated with any injury. The examiner opined that these age related changes were less likely as not associated with any complaints from military service. It was noted that there was no evidence of a chronic ongoing condition associated with service.

The Veteran reported significant on and off pain in the hips since the early 2000s. X-rays showed stable, mild degenerative changes of the right hip. The examiner diagnosed the Veteran with osteoarthritis of the hip and felt that it was not associated with rheumatoid arthritis. There was no evidence of complaint, treatment or evaluation of either hip during service. The examiner opined that it was less likely as not that the osteoarthritis was related to service and that there was no evidence that it was caused by or aggravated by active military service.

Regarding the back, the Veteran complained that sitting for any length of time and changes in weather aggravated it, and he limited his activities. He said the back occasionally woke him up at night and medications helped. On examination range of motion of the back was limited. The examiner noted that the back surgery that the Veteran had was due to the 1987 post-service work injury and he opined that the nature and etiology of the lumbar spine condition was directly related to that injury. The examiner further opined that it was not associated with rheumatoid arthritis, and that the Veteran had been misdiagnosed with this. The examiner stated that the Veteran had osteoarthritis which was not associated with military service.

X-rays of the lumbar spine from private treatment in February 2012 showed status post lateral bony fusion at L4-S1, early disc disease at L2-L3, and degenerative changes of the SI joints.

III. Analysis

Bilateral Shoulder and Right Hip Disabilities

This case presents many theories of service connection: affirmatively showing inception in service under 38 C.F.R. § 3.303(a); chronicity and continuity of symptomatology under 38 C.F.R. § 3.303(b); first diagnosed after service under 38 C.F.R. § 3.303(d); presumptive service connection for arthritis under 38 C.F.R. §§ 3.307 and 3.309; and secondary service connection under 38 C.F.R. § 3.310. In the discussion to follow, the Board will address each of the theories.

After a review of all the lay and medical evidence, the Board finds that the weight of the evidence demonstrates that the Veteran did not experience chronic symptoms related to his shoulders and right hip during active service or continuous symptoms related to them after his separation from service in March 1981. Current disabilities of the shoulders and the right hip are not shown to be related to an injury, disease, or even of service origin, including the service-connected rheumatoid arthritis. Further, no shoulder or right hip disability was diagnosed within a year of service, and therefore service connection for arthritis related to the shoulders and right hip on a presumptive basis is also not warranted.

Affirmatively Showing Inception in Service (38 C.F.R. § 3.303(a))

On the basis of the service treatment records alone, disabilities of the shoulders and right hip were not affirmatively shown to have been present in service. As previously described, there was no documentation of a right hip disability during service. Further, treatment records indicated that the Veteran was seen on occasion for arthritic pain in the right shoulder, and based on an earlier positive rheumatoid arthritis test, he received a diagnosis of rheumatoid arthritis in relation to the shoulder (and other joints). However, rheumatoid arthritis symptoms of redness, heat, and swelling of the shoulder were not observed on examination. Further, on subsequent physical examination in April 1980, there was no abnormality identified in the shoulders, although a skin abnormality was identified on the shoulder and chest. Also, on a medical history report at that time, he denied having a painful shoulder. With such evidence, it is the Board's judgment that a chronic shoulder disability was not shown to have began during service. Thus, service connection under 38 U.S.C.A. § 1110 and 38 C.F.R. § 3.303(a) (affirmatively showing inception in service) is not established. 

Chronicity and Continuity of Symptomatology (38 C.F.R. § 3.303(b)) and 
First Diagnosed After Service (38 C.F.R. § 3.303(d))

As the service treatment records lack the documentation of the combination of manifestations sufficient to identify a bilateral shoulder disability and a right hip disability, and as chronicity in service is not adequately supported by the service treatment records in the absence of persistent symptoms affecting the shoulders and right hip, then continuity of symptomatology after service under 38 C.F.R. § 3.303(b) is required to support the claim. Also, considering that a shoulder disability and a right hip disability were first definitively diagnosed years after service, the provision of 38 C.F.R. § 3.303(d) applies. 

The medical evidence of record shows that the Veteran has been diagnosed with bilateral degenerative changes of the shoulders and that he had surgery in December 2006 for a SLAP tear of the left shoulder. It also shows that the Veteran has been diagnosed with osteoarthritis of the right hip. He contended that the osteoarthritis in these joints is so severe that it had to be longstanding. 

The record contains medical evidence relating the Veteran's current arthritis in the shoulders and right hip to service. Dr. O wrote in May 2006 that the Veteran's osteoarthritis, which was extensive for his age, was mostly a result of physical exertion and strain from military service, and in October 2007 he wrote that it was most likely related to military service. Likewise, Dr. L wrote in May 2009 that the Veteran's osteoarthritis was out of proportion for his age and was most likely related to military service. The Court of Appeals for Veterans Claims (Court) has stated that "most of the probative value of a medical opinion comes from its reasoning" and that the Board "must be able to conclude that a medical expert has applied valid medical analysis to the significant facts of the particular case in order to reach the conclusion submitted in the medical opinion." Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 304 (2008). Probative value cannot be given to the opinions of Dr. O and Dr. L because they did not review the claims files, give any consideration to the effects of the Veteran's 1987 industrial accident, or provide rationale for their conclusions. As the opinions are essentially conclusory, they have little probative weight on a material issue of fact, that is, a connection between the current disability and the Veteran's period of service, when compared to the subsequent opinions of the VA examiners. See Stefl v. Nicholson, 21 Vet. App. 120, 123 (2007) (A mere conclusion statement by a private physician is insufficient to allow the Board to make an informed decision as to the weight to assign to the opinion against a contrary opinion); Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 304 (2008) (the guiding factors in evaluating the probative value of a medical opinion include whether the opinion is based upon sufficient facts, and whether the opinion applied valid medical analysis to the significant facts of the case in order to reach the conclusion submitted in the opinion). 
 
On the other hand, based on a review of the claims file, the VA examiner in May 2009 asserted that the Veteran had osteoarthritis that was less likely as not manifested during service and that his right hip disability was related to osteoarthritis or degenerative joint disease, which was a condition of aging and due to wear and tear and not spread from one joint to another as might be seen in an individual with rheumatoid arthritis. Also based on a review of the claims file, the VA examiner in November 2010 asserted that the Veteran had age related changes in the shoulders not associated with any injury. The examiner opined that the shoulder disabilities were less likely as not associated with any complaints from military service, and it was also noted that there was no evidence of a chronic, ongoing condition associated with service. Regarding a diagnosis of osteoarthritis of the right hip, the examiner also opined that it was less likely as not related to service, noting that the right hip was not treated during service and that there was no evidence that the osteoarthritis in the hip was caused by or aggravated by military service. These opinions are of probative value because they were accompanied by rationale that accounted for the significant facts in the record. See Nieves-Rodriguez, 22 Vet. App. at 304. 

In short, service connection based on disability initially diagnosed after service under 38 C.F.R. § 3.303(d) is not warranted

In the case, the Veteran complained of progressive shoulder pain since service and that his arthritic joints were so severe that they must have been longstanding. As it does not necessarily follow that there is a relationship between the bilateral shoulder and right hip disabilities and the continuity of symptomatology to which the Veteran alludes, medical evidence is required to demonstrate such a relationship, unless such a relationship is one which a lay person's observation is competent under case law or the condition is a simple medical condition. See Savage v. Gober, 10 Vet. App. 488, 496-97 (1997); see Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007) (under certain circumstances, a lay person is competent to identify a simple medical condition).

It is acknowledged that the Veteran has not demonstrated that he has expertise in medical matters. While there is no bright line exclusionary rule that a lay person cannot provide opinion evidence as to a nexus between an in-service event and a current condition, not all medical questions lend themselves to lay opinion evidence. See Davidson v. Shinseki, 581 F.3d 1313, 1316 (Fed. Cir. 2009). In Davidson, the Federal Circuit referred to Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007) for guidance. In footnote 4 of Jandreau, the Federal Circuit indicated that the complexity of the claimed disability is to be considered in determining whether lay evidence is competent. As to a nexus opinion relating his current bilateral shoulder and right hip disabilities to service, the Board finds that the etiology is too complex an issue to lend itself to lay opinion evidence. 

The Veteran, his wife and friends are competent to testify as to symptoms that are non-medical in nature; however, they are not competent to render a medical diagnosis or etiology. See Barr v. Nicholson, 21 Vet. App. 303 (2007) (lay testimony is competent to establish the presence of observable symptomatology that is not medical in nature); see also, Woehlaert v. Nicholson, 21 Vet. App. 456 (2007) (certain disabilities are not conditions capable of lay diagnosis). 

Competency is a question of fact, which is to be addressed by the Board. Jandreau at 1377. Competent medical evidence means evidence provided by a person who is qualified through education, training, or experience to offer a medical diagnosis, statement, or opinion. 38 C.F.R. § 3.159. Also, under certain circumstances, a lay person is competent to identify a simple medical condition, a contemporaneous medical diagnosis, or symptoms that later support a diagnosis by a medical professional. Jandreau at 1377. Also, the Veteran as a lay person is competent to offer an opinion on a simple medical condition. Davidson v. Shinseki, 581 F.3d 1313, 1316 (Fed. Cir. 2009) (citing Jandreau v. Nicholson, 492 F.3d 1372 (Fed. Cir. 2007)). In this case, the Veteran, his wife and friends are not shown to have the requisite medical training or experience; the bilateral shoulder and right hip disabilities are not considered simple medical conditions as their diagnoses require specific testing and cannot be based on mere personal observation; and there are no contemporaneous diagnoses or symptoms from service upon which a medical professional has specifically referred in support of current diagnoses. 

It is also noted that the Veteran testified at the January 2010 hearing that his shoulders hurt during service and that the pain had gotten progressively worse over the years. The service treatment records show that on medical history reports dated in May 1976, August 1977, and April 1980, the Veteran indicated that he had never had a painful or "trick" shoulder. In addition, an April 1980 examination did not show any abnormalities related to the shoulders or right hip. In other words, the Veteran's current claims are not consistent with the medical evidence contemporaneous with service or with his own reports of medical history given during service, which would tend to be more reliable than assertions made decades later in the context of applying for benefits. 

In short, service connection based on continuity of symptomatology since service, related to the shoulders and right hip, is not warranted because the records show that the in-service complaints related to the shoulders were not chronic until many years after service and there were no complaints related to the right hip in service or for many years thereafter. See 38 C.F.R. § 3.303(b).

As the unfavorable competent evidence outweighs the evidence favorable to the claims, the preponderance of the evidence is against the claims based either on continuity of symptomatology under 38 C.F.R. § 3.303(b) or on a disability first diagnosed after service under 38 C.F.R. § 3.303(d), and the benefit of-the-doubt standard of proof does not apply. 38 U.S.C.A. § 5107(b). 

Presumptive Service Connection (38 C.F.R. §§ 3.307, 3.309)

As for presumptive service connection for arthritis of the shoulders and right hip as a chronic disease under 38 C.F.R. §§ 3.307(a)(3) and 3.309(a), osteoarthritis affecting these joints was first documented many years after service, which is well beyond the one-year presumptive period after discharge from service in 1981, for presumptive service connection as a chronic disease. Thus, the preponderance of the evidence is against the claim on this theory of service connection, and the benefit of-the-doubt standard of proof does not apply. 38 U.S.C.A. § 5107(b). 

Secondary Service Connection (38 C.F.R. § 3.310)

On the question of whether the bilateral shoulder and right hip disabilities were caused by or aggravated by the service-connected rheumatoid arthritis, as alleged, to the extent the Veteran asserts that there is an association between his joint disabilities and rheumatoid arthritis, the Veteran's opinion as a lay person is limited to inferences that are rationally based on his perception and does not require specialized education, training, or experience, which was explained previously. As the Veteran, as a lay person, is not competent to diagnose osteoarthritis of the shoulders and hips based on personal observation, any inference based on what is not personally observable cannot be competent lay evidence. Further, it is not argued or shown that the Veteran is otherwise qualified through specialized education, training, or experience to offer an opinion on the question of secondary service connection. 

As a preliminary matter, the current records overwhelmingly show that the diagnosis of rheumatoid arthritis made during service was incorrect. A VA primary care provider indicated in August 2010 that the Veteran could have seronegative rheumatoid arthritis, but testing to verify this appears not to have been performed. The other post-service diagnoses of rheumatoid arthritis, as mentioned in the factual background above, appear to have merely been a repetition of the in-service diagnosis, or a recitation of the Veteran's own self-described history of rheumatoid arthritis, because testing was not performed at those times to either rule in or rule out such a diagnosis. A bare conclusion, even when reached by a health care profession, is not probative without a factual predicate in the record. See Miller v. West, 11 Vet. App. 345, 348 (1998); Reonal v. Brown, 5 Vet. App. 458, 461 (1993) (a medical opinion based on an inaccurate factual premise is not probative). Therefore, the post-service reports that document rheumatoid arthritis are not credible. 

On the other hand, VA rheumatology treatment records in March 2006 indicate that there was a low possibility that the Veteran had rheumatoid arthritis based on the physical examination, laboratory results, imaging, and history. Further, Dr. O wrote that the Veteran had never had rheumatoid arthritis, and the VA examiner in May 2009 stated that the diagnosis of rheumatoid arthritis was incorrect and that the tests during the Veteran's service were less accurate than the ones developed later. Dr. N wrote in January 2010 that he did not see evidence of inflammatory disease, such as rheumatoid arthritis. The VA examiner in November 2010 also asserted that the Veteran had been misdiagnosed with rheumatoid arthritis. 

The weight of the evidence, therefore, shows that the Veteran does not currently have rheumatoid arthritis. Further, the weight of the evidence does not support his claim that his current bilateral shoulder and right hip conditions are caused or aggravated by service-connected rheumatoid arthritis, particularly as the overwhelming medical evidence shows that he does not have rheumatoid arthritis. 

In sum, the preponderance of the evidence weighs against the claim under the theory of secondary service connection under 38 C.F.R. § 3.310, and the benefit of-the-doubt standard of proof does not apply. 38 U.S.C.A. § 5107(b). 

For the above reasons, service connection for bilateral shoulder and right hip disabilities, considering the applicable theories of service connection, is not established. 

Left Hip and Lumbar Spine Disabilities

The Board now turns to the issue of severance of service connection for a left hip disability and a lumbar spine disability. As discussed above, the in-service diagnosis of rheumatoid arthritis was erroneous and the Veteran is not currently shown to have rheumatoid arthritis. However, under VA law and regulations, service connection for any disability that has been in effect for 10 or more years will not be severed except upon a showing that the original grant was based on fraud or that military records show a lack of the required service or character of discharge. 38 U.S.C.A. § 1159; 38 C.F.R. § 3.957. In a July 1981 rating decision, service connection was granted for rheumatoid arthritis in multiple joints, and the Veteran was assigned a 20 percent evaluation. As the award unfortunately did not identify all joints specifically affected by the rheumatoid arthritis at that time, this has complicated the present matter. 

Historically, the RO in a June 1983 rating decision reduced the evaluation for rheumatoid arthritis from 20 percent to noncompensable (0 percent). Then, in a November 2004 rating decision, the RO discontinued the previous noncompensable evaluation for rheumatoid arthritis in multiple joints, and in its place the RO granted service connection for left hip arthroplasty (evaluated as 30 percent disabling) and rheumatoid arthritis, lumbar spine (evaluated as 10 percent disabling). This action shows the RO considers the left hip and lumbar spine disabilities to be related to the arthritic process for which service connection was originally established in 1981. In itself, the action is not considered severance of service connection for rheumatoid arthritis because it merely involved assigning different diagnostic codes for the same disability. See Read v. Shinseki, 651 F.3d 1296, 1300 (2011) (holding that service connection for a "disability" is not severed simply because the situs of a disability - or the Diagnostic Code associated with it - is corrected to more accurately determine the benefit to which a Veteran may be entitled for a service connected disability). In other words, the RO was re-designating the ratings in order to accurately reflect the actual anatomic location of the disease of rheumatoid arthritis, by re-characterizing the former rheumatoid arthritis of multiple joints as a left hip disability and a lumbar spine disability. 

Stated further, the grant of service connection for left hip arthroplasty and rheumatoid arthritis, lumbar spine, was simply a re-classification of service connection for rheumatoid arthritis, multiple joints, which had been in effect for over 10 years. The rating award did not establish a new basis for disability compensation; rather, it effectuated an increase in the Veteran's service-connected disability of rheumatoid arthritis through the assignment of separate compensable ratings for a left hip disability and a lumbar spine disability. 

It is observed that the RO in a November 2005 rating decision proposed to sever service connection for left hip arthroplasty and rheumatoid arthritis, lumbar spine. At the same time, it restored service connection for rheumatoid arthritis in multiple joints at a noncompensable rating. The proposed severance was effectuated in a June 2007 rating decision, and was made effective on October 1, 2007. 

The fact that the overwhelming evidence shows the Veteran does not now have rheumatoid arthritis and was misdiagnosed with the disease in service does not negate the fact that he was recognized as having a disability during service for which service connection for "multiple joints" was established. Service connection for disabilities of the left hip and lumbar spine is protected and cannot be severed because they were acknowledged by the RO to be part of the disability for which service connection had been in effect for over 10 years, as indicated by its rating decision of November 2004. The RO subsequently sought to reverse its action in a November 2005 rating decision, stating that it was clear and unmistakable error for it to have established service connection for the disabilities when VA medical evidence showed that they were not related to rheumatoid arthritis. However, the RO had found in November 2004 that the left hip and lumbar spine disabilities, to the exclusion of all other joint disabilities up to that time, were part and parcel of the service-connected multiple joint disability characterized as rheumatoid arthritis that had been in effect for more than 10 years, and in making such a finding service connection for the joints cannot be severed later upon the reasoning that the joints did not have a diagnosis of rheumatoid arthritis. Absent evidence that service connection had been awarded in 1981 due to fraud by the Veteran or that he did not have the requisite service or classification of discharge for a grant of service connection, which is not shown in this case, service connection for disability that has been in effect for at least 10 years is protected and may not be severed. 38 U.S.C.A. § 1159; 38 C.F.R. § 3.957. 

In light of the foregoing, the Board finds that the severance of service connection for a left hip disability, status-post hip replacement, and a lumbar spine disability, effective October 1, 2007, was improper and restoration of service connection for the disabilities is thus warranted. 


 ORDER ON NEXT PAGE

ORDER

Service connection for a bilateral shoulder disability is denied.

Service connection for a right hip disability is denied.

The severance of service connection for a left hip disability, status-post hip replacement, effective October 1, 2007, was improper, and restoration of service connection is granted.

The severance of service connection for a lumbar spine disability, effective October 1, 2007, was improper, and restoration of service connection is granted.




______________________________________________
Debbie A. Breitbeil
Acting Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs